Mr. Ross, the court takes on the documents 18-0620, the people of the state of Illinois, defendant Mr. McKelvy, the notice of seeing McKelvy and statement of his partner, defendant Ms. McAuley. Arguing on behalf of the defendant McAuley, up to the point of the felon, Mr. Steven A. Rogers. Arguing on behalf of the defendant Ms. McAuley, Mr. Eric F. Monfort. Also arguing on behalf of the defendant Ms. McAuley, Mr. Lawrence L. Wade II. Mr. Rogers, before we begin, the court was aware that McKelvy was set for today, but the defense did not comply with local rule 112 in your docketing statement and indicate there was a related case. But there's no problem here because we have the briefs and we will read the briefs and listen to arguments from both parties. So Mr. Rogers may proceed, but remember that in the future, you must comply with all the rules, which requires you to notify the court immediately in your docketing statement that there's a related case. Go ahead. Do you have a question, Mr. Reinhart? No, I'm done. I apologize. I don't have anything to do with that quote. No, I see. Okay. Go ahead. Good morning, Your Honors. Counsel, may it please the court. My name is Stephen Rogers and I represent the people of the state of Illinois. Your Honors, the state is before you this morning to request that this court reverse the trial court's decision to grant defendants motion to suppress evidence. In its brief, the state relied on two main points. One is that the trial court's ruling was based in large part on a disavowed part of the reasonableness analysis, and that is whether the officer's actions altered the fundamental nature of the stop. And second, the trial court also incorrectly held that the stop in this case was impermissibly prolonged beyond the time reasonably required to complete the stop. The entire stop in this case, from the moment Officer Alka curbed the vehicle for speeding violation to the moment when the firearm was found in the passenger door, approximately seven minutes had elapsed. Only one and a half to two minutes elapsed from when Officer Alka had completed running the check on the driver's license, the insurance, and the warrant checks on the driver and passengers. At that point, Officer Alka asked the driver to exit the vehicle and then asked Officer Tolver to have the passenger exit the vehicle. And at that point, a firearm was found. In both Reedy and Harris, unrelated activity unquestionably took place. There was some activity directed at a drug investigation. But that did not by itself constitute an unlawful or unconstitutional stop. What this court did in Harris, which relied in part on Reedy, is ask whether but for any unrelated activity, the officer would have finished writing the citation or the warning and delivered it to the defendant before probable cause was established. And in this case, it can be said that Officer Alka, had he not asked the driver and passenger to exit, and had he simply went back to his vehicle to start writing the citation, there's really no argument that he would have completed that activity within the seven minutes. Doesn't the Rodriguez case, though, even a de minimis increase in the length of the stop is not permissible? Your Honor, in Rodriguez, the stop was already completed. And that was the same situation that occurred in Paddy. And so if you take the time necessary to complete the mission or the time reasonably required to complete the mission, you can't tack on time to that. That's the de minimis. If something happens within the stop that doesn't prolong the stop, then the argument is not de minimis anymore. De minimis is a completed stop or a stop that should reasonably have already been completed. The trial court's judgment and the defense argument in large part in this case focuses on Officer Alka's decision why he asked the driver and passenger to exit, because he was interested in the shooting, at least in part. The case law is clear that where an officer is acting in an otherwise objectively reasonable manner, you don't look to subjective intent to invalidate the actions. And that's exactly what the trial court did in this case and what the argument is. Under Sorensen, Officer Alka could have asked the driver and passengers to exit without giving a reason, as a matter of course. That's lawful under the Fourth Amendment. So you can't, therefore, look at a subjective reason to invalidate that otherwise objectively reasonable action. And Wren certainly has been applied in numerous settings. It's not limited to an initial stop. It was applied in Devenpeck v. Alford, a case where the officer stops someone who is potentially impersonating an officer, has lights on top of the car, and when he approaches, realizes that the defendant is also audio taping, which the officer thinks may be a violation of Washington's Privacy Act. So the officer makes the arrest. His subjective reason for making the arrest was only the violation of the Privacy Act, which turned out not to be a violation at all, no probable cause, no basis for that arrest. But the U.S. Supreme Court says the action was objectively reasonable because there was a solid basis for the arrest, probable cause based on impersonating an officer and then also obstruction of justice. The trial court commented that officer safety issues did exist, but that should have been taken care of right away, not letting them sit in the cars on their cell phones if there was a true fear of guns. Is that – can you comment on that? Well, Your Honor, I think it's irrelevant because Solrenson says as a matter of course you can take them out. And Maryland v. Wilson specifically also talked about the officers can do this even without regard to any potential danger. So they don't have to have a specific fear because it's well known that any trafficking encounter is dangerous. Yes, Your Honor. And so I think a lot of it becomes a red herring. The shooting investigation is almost irrelevant. And, I mean, just from a practical standpoint, Officer Alka shows up, he's by himself for the first two or three minutes of the stop. And so you're only a couple more minutes until they're asked to step out once all three officers are there. The trial court also said, quote, I believe the traffic stop was extended without sufficient evidence for it to be extended and morphed into an investigation regarding the shooting. Does that – Well, Your Honor, I think the morphed comment in large part goes to whether the officers' actions altered the fundamental nature of the stop. Which is no longer – Which is no longer a part of the analysis. And all you look at is whether the stop is impermissibly prolonged beyond the time reasonably required. Certainly the trial court didn't look at any of the temporal aspects of the case. And this was a very brief detention, seven minutes until the firearm was found. And I don't think there's a case out there that says a traffic stop with three individuals in the vehicle would be completed in less than seven minutes. Well, there's cases with 10 minutes, 15 minutes that have been held to be reasonable. Yes. It depends on the facts and circumstances of the particular case. Your contention here is that seven and a half minutes simply was within bounds of reasonableness. Yes, Your Honor. And I think Reedy was 10 minutes, and they said that was an extremely brief stop. I mean, you have three different individuals in the vehicle. It's late at night, and you have a couple backup officers. What time was this? It was 1.45 a.m. A.M. Yes, sir. And the stop was on Martin Luther King, which was referenced to be a heavier traffic area, although there may not have been a lot of traffic that night. It would certainly be an area where an officer may want to conduct any conversation on the side of the road. At the time when he – I think it was when Judge Poniak says, you know, he has them sitting in the car talking on their cell phones, if there was a true fear of guns, why would he leave them there? How long after they were stopped did backup appear, do you know? Around three minutes. So would it have been prudent for him to take them out of the car prior to backup? Well, no, Your Honor. I think that's even what the officer said. You almost want to gain some sort of rapport. I mean, you don't want to come out guns blazing and, you know, ordering these people out of the car. That would elevate any potential for violence. So at a minimum, you wait for the other officers to arrive. And you can hear on the squad, on the body cameras, once the other officers arrive, he's still finishing up the checks. And once he finishes up, he immediately tells Officer Freer, get the driver out of the vehicle. And the driver doesn't want to get out, and that takes about a minute. Once they get the driver out, he immediately says, let's get the passenger out to Officer Tolver. So this wasn't a case where they're waiting eight to ten minutes after all three officers are there to request that the driver and passenger is exited. So he initially talks to them before the backup arrives, correct? Yes, Your Honor. What about the failure of the officers to immediately activate their body cameras? Not great, Your Honor. I don't know that it affects much because they're turned on really quick. You can tell the squad video was on the whole time. So you get the temporal aspect that this was only a seven-minute stop. The only thing you miss is the first approximately 30 seconds of Officer Alka's. But Officer Alka's body cam is then on for the other two officers' approach. So the fact that their body cameras weren't on, I don't think would add or detract from the case. So it's your position that the case should be reversed? Yes, Your Honor, reversed and remanded for further proceedings. For trial, not for further hearing on the motion? No, Your Honor, just for trial. Thank you. Mr. Reinhardt? No, the two of you are going to split your time. Is that...? And Mr. Reinhardt, you're correct. I think the State did point out in their document stating a related case. So, again, we'll read, obviously, co-counsel's brief or pardon's brief. But it doesn't prejudice you. No, I'm sorry, Judge. I was just thinking about that. No, that's okay. It was so long ago. It's on us. Thank you. And may it please the Court, and, again, Eric Reinhardt on behalf of Mr. Harden. On behalf of Mr. Harden. Now, Mr. Harden was which passenger? Mr. Harden is the front seat passenger. Okay. Front seat passenger. And Mr. McKelvey is the back seat passenger. Okay. The driver, I believe, is Mr. Davis. I apologize. Mr. Smith. Mr. Smith is the driver and Mr. Harden is the back seat passenger. And Mr. McKelvey is the back seat passenger and Mr. Harden is the front seat passenger. I thought in the trial court you represented McKelvey. No, I represented Mr. Harden. Okay. So, Your Honors, I think, respectfully, with respect to counsel's arguments, I think in order to get around Rodriguez, he has talked somewhat about the overall length, and I agree with Justice Shostak's question, that there really isn't a de minimis rule. And if you look at the reasoning in Rodriguez, and this is cited in my brief, Rodriguez, the Supreme Court justices in Rodriguez took time to reject the de minimis finding of the other court's approach. So I don't think respectfully I disagree with counsel's focus on the overall time. And if I could point to Patty, which is a 2017 case, you know, in Patty it wasn't a very long delay. In Patty, the court found that the delay is only the time it would take maybe to cross this entire room. I don't know how far the squad car is from the target vehicle. But all he did that prolonged it was his second walk-up, because his second walk-up had to do with determining the insurance status, but it was an out-of-state vehicle. So the court found that that was an impermissible delay. If you think about the time, that has to be shorter than our time here. To be clear, the overall delay in the case occurs when they ask them to get out of the vehicle, even though they've already checked for warrants, checked for plates, and checked items. So it is that moment that starts the delay. That's not a delay, though. That's not an impermissible delay, because law enforcement officers are entitled to ask both drivers and passengers to exit a vehicle, correct? Yes, and that's my next point, and I want to address that. They're attending to safety concerns at that point. So I respectfully do not believe that under Rodriguez and under Mims and under Wilson that you can always get the driver and passenger out in every situation. The officer in Rodriguez would not have saved himself, the Nebraska deputy, would not have saved the stop if he had merely asked the gentleman to get out. If Mr. Rodriguez had been asked to leave the vehicle, it wouldn't have saved the stop. The problem in Rodriguez was that the mission was over and should have been over, and then the stop took too long. And I want to talk very quickly about Mims and Wilson. Mims and Wilson actually both say that officers may ask people to exit the vehicle to complete the mission of the traffic stop. In Mims, he didn't want to watch the guy go through his wallet. He wanted him out of the vehicle. In Wilson, he didn't want that passenger in the back of the car while the driver was going through the glove compartment. So, yes, I think the overall rule is for safety concerns, Justice Shostak, but it is always in the name of the mission. In Mims, he's getting out his license. In Wilson, they're going through the glove box. Those mission-related reasons are permissible for a safety issue. But in this case, you – it was a speeding stop, but they also have information of a shooting in Lake Forest. So both – I think the trial court found – the trial court found that there was not enough evidence to warrant the extension. And, frankly, I think that the State conceded that in its brief. The State's brief seems to be entirely focused on the issues we've talked about so far this morning, the extension of the stop, the diligence. The State – this is how I'm reading the brief, and certainly Mr. Rogers can correct us when he gets back up. But I didn't read the State's brief to say that there was enough to warrant the extension. I understood the issue to be this very intense and compact fight about how do we deal with an extension. Let me ask you this. Sure. There was no specific finding by the trial court of an unreasonable extension. The trial court didn't say an unreasonable extension. The trial court said, I believe the traffic stop was extended without sufficient evidence for it to be extended and morphed into an investigation regarding the shooting. That's what the trial court said. Yeah, and so I think – yes, and I think – Let me ask you this. Oh, I'm sorry. Just to confirm if I'm wrong, because they know you're wrong and here's why. Okay. The United States Supreme Court said in Arizona v. Johnson, and we know this, that inquiries into matters unrelated to the stop that do not confer the encounter, so long as those inquiries do not measurably extend the duration of the stop. How did the – asking the individuals to get out of the car and to ask the question about – well, the initial question, where are you going? We're going to the hospital. Our cousin was shot. Now, that's also information the officers have. So where's the unreasonable extension? Overall, it's seven and a half minutes, correct? Right. I agree. That's the overall stop. So where's the unreasonable extension? The unreasonable extension is at about – I think the overall stop, let's say, is 730, just for roughly. I think the unreasonable stop occurs at about 5 minutes and 45 seconds. What occurs at that point? Because at that point, ALCA is not writing the ticket. Unlike the officers in Reedy and Heritch – and Rodriguez is different. Unlike the officers in Reedy and Heritch, they were in the process of either writing the warning or, in Heritch's case, converting the warning into a full citation. In Heritch, in Reedy, he's writing the ticket. Is an officer, whether there's other officers at the scene or not, is an officer required to immediately start writing the ticket while there are still safety concerns? Well, as Judge Piconiak said, the safety concerns at this point are minimum. And this was from some questioning that Mr. Wade did. I'm not talking about the trial court. I'm talking about reasonableness, objectively reasonable. A police officer who stops three individuals who are on their way to the hospital following a shooting, and he's alone on the side of the road. Well, he actually walked up on the passenger side. And then he waits for backup and then commands the driver to get out of the car and indicates to his fellow officer to get the passengers out. And there's the gun. So you're saying he should have been writing the traffic ticket instead of doing those things. Well, you have to remember for the other portion of the stop, they've already run the driver for warrants and they've run. But those first five minutes are important because there's not the furtive movements. The trial court found there weren't furtive movements or nervousness. So those first five and a half minutes, now the other officers have arrived. Now they've learned that they don't have warrants. They've learned that his driver status is clear. And ALCA specifically says, I got him out to talk about the other, to talk about the shooting. And so I agree with you. I understand your question. He doesn't have to immediately start writing the ticket. But nobody was writing the ticket, unlike the other cases. But at that point, they find a gun. So what's he going to do? Oh, you guys take care of that gun. I'm going to go write a ticket. No, I think the problem is when he asked them to get out, at the moment he asked them to get out, they haven't found the gun. And it's his, frankly, it's his honest answer. It's his honest answer that he says, I wasn't writing the ticket at that point. I wasn't working on the ticket at that point. And I think you know how I mean this, Justice. He honestly says, I had abandoned that portion of the stop. And I think ALCA thought that he had reasonable suspicion to investigate this other crime. Respectfully, I think the trial court said, well, you didn't have that reasonable suspicion. And your mission for your traffic stop, you weren't even working on your mission for your traffic stop. I know my time has come up. May I say one thing about Wren? Go ahead. I don't think, respectfully to counsel, I don't think Wren has been applied when we're analyzing diligence and stalling. If you really mind the facts of each one of these cases, they always do ask what the officer was doing. In Heritch, no, excuse me, in Reedy, the officer said, we got him out in order to explain the traffic stop. They do look at what the officer is thinking during this diligence. They do. However, under the Supreme Court, under Rodriguez, so long as that other inquiry does not unreasonably prolong the stop, the time that it would, in ordinary circumstances, take to write the ticket, to complete the stop, all the checking background, and then writing the ticket, discussing whatever information the passenger or the driver may offer, and to complete that. It's not, regardless of what the subjective intentions of the police officer, you look at the reasonableness of the time. Is that correct? No, I think you look at whether the mission is complete. And because they had already performed those other checks, it's that moment where he asks him to get out between that time and the discovery of the gun, which I acknowledge is only a minute 45. But I do think that's the minute 45 where we are very, as I said earlier, it's a very compact analysis in that minute 45. I don't think it's the overall length of the stop, but it's from the moment he asks him to get out and he's not writing a ticket or doing anything else related to the traffic stop, and then the gun is discovered a minute 45. My point is that you're asking us to say at this point in time he should have been writing the ticket instead of doing something else. Is that your point? No. My point is that he should be honest, which he was. And at the moment that he gets him out of the car, if it's not for a mission-related purpose, then any extension even – I'm not going to use the word de minimis because Rodriguez rejected that. If he is not doing – when he asks him to get out of the car, if that is not mission-related, then I think we have an improper extension. So I don't think there's a timeframe. I think Rodriguez teaches us there's not a timeframe. It's the mission. And once he says I'm not – once he says I'm not writing the ticket, I'm not doing anything related to the traffic stop, then it's that second extension that happens. And I agree with Caballos. I'm not talking about transforming the nature of it. I'm talking about there being actual time between the exit and the discovery of the gun, which I acknowledge and which we acknowledge is a minute 45. He would have never been done writing the ticket at the time they discovered that gun. Correct? I don't know. He may have made a decision to not write any warning or ticket at all. We weren't able to cross him on that because he openly admitted that he wasn't writing the ticket. Well, instead of asking the defendant to exit and asking to pull over, he would have had to go back to his squad car to pick out his ticket book and write on his whatever clipboard the ticket or tickets that he was going to issue. Right, but at that point he wouldn't have been asking the gentleman to exit. Didn't our Supreme Court say in Harris that the reasonableness of the stop is judged by its duration, not whether the actions of the police altered the fundamental nature of the stop? That's what the Court said, correct? I think Rodriguez refocuses on the overall length. In this case, there was an extension of a minute and 45 seconds. I think that if the dog had walked up during the first five minutes and 45 seconds, this wasn't a dog case, but that's what I said it was. If the dog had walked up during the first 545, then I don't think it would be a violation. My question was, did Harris say that? Harris said, yes, I agree that Harris said that. Okay, thank you. Your Honors, Mr. Reinhardt, may it please the Court. Briefly, as Mr. Reinhardt had an opportunity to answer most of the questions of the Court, however, I would reiterate that I would agree with Mr. Reinhardt in the fact that we believe that the intrusion on the Fourth Amendment occurs once Officer Alka abandons his particular mission of issuing the traffic citation and echoing the trial court judgment in that at that point the officer had abandoned his mission of issuing a traffic citation and instead intended to move forward with a shooting investigation. Well, his camera, Alka's quality camera shows that approximately 80 seconds passed from the time Smith was asked to get out of the car and the gun was discovered. So it was extended. There was 80 seconds that passed right there. Isn't the question, could the traffic ticket have been written within 80 seconds? Justice, I would say that the mission could have been continued during those 80 seconds. I would put forth to the Court that in other cases, as Mr. Reinhardt has pointed out, the traffic citation is actually being addressed. It's either being written or a passenger or the driver is being asked to exit the vehicle so that the traffic citation could be explained. Therefore, in all of the cases that we have, we have instances where the officers continue with their mission as far as issuing a traffic citation. So he says, so he hears this teleburst say, he's got a gun, and he's going to say, excuse me, I've got a traffic ticket, I've got to write. Hasn't it now become a different arrest at this point? Well, Judge, Justice, I would agree with you that at that point the entire traffic stop changed. However, our argument remains that it had changed before Tolbert had ever found the gun. And it was during that change. Can you have a pretextual stop? A pretextual stop, yes, Your Honor. But the issue that we're having here is that the stop in and of itself was valid. Now, when they then continue and go outside the scope of the actual mission of issuing a traffic citation, I believe that's when we start to get into some areas where. . . But that is contrary to what the United States Supreme Court said. And I quoted the language from the court. I mean, as long as the other inquiries do not unreasonably prolong the duration of a stop, it's not inappropriate for officers to ask questions to get somebody out of the vehicle, as long as it's not going to prolong the duration of a stop. And it's proper to ask both the driver and the passenger to exit the vehicle. What about the resistance when Tolbert tried to open the door? And, Your Honor, I think that specifically to speak about the resistance, I think that at that point we have a situation where Tolbert may now have some more suspicion. It may have risen to a level to where now they have the authority to pull him out of the vehicle. But we continue to say that if any extension, we would believe the time that ALCA abandons the idea of the citation, which we are afforded with his, despite the fact that it delves into his subjective intent. We have that opportunity out of ALCA that he is no longer focusing on the traffic citation, but instead he's investigating, he's practically opened up an interrogation on the side of the law. So was the detour longer than the time it would take to complete writing the traffic stop? I can't say that it would have been. So wasn't that the relevant question? I believe that that plays into the overall analysis, and I would agree with the Justice that that is the question, whether or not it impermissibly extended the stop. I think that if we were to instead have Officer ALCA argue, even though if he would have gone straight back to his vehicle and began to write his ticket, and then we take those 80 seconds and put it at the end, then I think at that point we might have a question about whether or not that traffic citation was, or the traffic stop was then extended. Well, it's your burden. Yes. It's your burden. It's not the State's burden. The overall burden remains. Once you shift the burden to the State, the State has an opportunity to rebut, but you have to – your burden is to carry the day. You argued in the trial court that ALCA, quote, never had an intention of writing the ticket. He only wanted to get into the car and put down these individuals. And, quote, you said this is not a situation where Officer ALCA felt any sort of issues as far as officer safety. Now, that's not the standard, is it? That's not the standard, Judge, but when we were making our argument. That's what the trial court said, though. The trial court bought into your argument. The trial court said officer safety issues did exist but should have been taken care of right away, not letting them sit in the car on their cell phones if there was a true fear of guns. The officers don't have to have a, quote, unquote, true fear of guns specific to the individual, because if they did, there would be a lot more dead cops out there. They don't have to have a rationale to ask passengers and or a driver to exit a vehicle during a traffic stop, do they? No, Judge, and I think that at the trial level, we were – I think what Judge Poconiak was pointing out was, as Your Honor questioned the State, there was a motion for sanctions based on the fact that Officer ALCA, Officer Tolbert, and Officer Field all failed to put on their cameras. They also testified – those officers testified to specific nervousness and observations that they made while approaching the vehicle before the actual cameras came on. I do understand that the squad video was there. However, the actual faces could have been captured, some of this nervousness, some of the things that they testified to could have been captured on those body cameras. And I believe that Judge Poconiak was – after making specific determinations as far as credibility is concerned, pointed out that they were no longer – they did not – that Justice – or that Judge Poconiak did not leave the officers when they indicated that they were intending to pull them out for officer safety. Despite what the standard may have been, I believe he was making a determination based on credibility of those officers. And there are subjective goals or objectives, right, to basically get into the car, see what's in the car? Yes, Judge, and I believe that there's – Justice, I believe that there's specific conversations on the body camera. You can hear ALCA talking to other officers and specifically pointing out what he was intending to do. And once again, Justice, it would be then his subjective intent. Anything else, Mr. Wright? I have nothing further. If there's no further questions. Thank you. Thank you. Mr. Rogers, rebuttal. Thank you, Your Honor. Just a few quick points. In Patty, the warning had already been completed. The officer puts it off and then takes the action. So at that point, the stop is done. You're saying like a written warning? Written warning is done, and I actually think potentially the driver's in the car with him, and he goes up to ask the owner of the vehicle about insurance. And so the warning's done. It can be handed over, but the officer takes – engages in conduct beyond that point. I think the gist of Arizona v. Johnson, unrelated questioning is okay. So it's hard to fathom a situation where planning to engage in unrelated questioning could render a stop unconstitutional when actually engaging in the unrelated questioning is fine. And the court has put up a stamp of approval. So long as it doesn't impermissibly extend the duration of the stop. Exactly. In reading Harris, the officers do say we're going to start writing a warning. But that would be hard to believe. That would be the – what makes the officer's conduct reasonable to say, well, I'm going to pull out my citation book and then go engage in unrelated questioning. That makes the stop okay. But securing the scene first before writing the citation is what finishes off the state's case, essentially. And the bottom line from our perspective is you look at what the officers do, not why they do it. If what they do is objectively reasonable, then you don't look at their subjective motivation for the action to invalidate it. No. Thank you. Thank you, Your Honor. We respectfully request that this Court reverse the case and remand further trial. The Court thanks all the parties for the quality of your arguments today. The case will be taken under advisement. A written decision will be issued in due course. Thank you.